SULLIVAN *v.* STATE.

(Division B.   Oct. 16, 1939.)

[191 So. 413.   No. 33773.]

**Edwards & Edwards,** of Mendenhall, for appellant.

**W. D. Conn, Jr.,** Assistant Attorney-General, for the State.

**Ethridge, P. J.**, delivered the opinion of the court.

At the March term, 1939, of the Circuit Court of Simpson county, Homer Sullivan was indicted for the murder

of one, Tommie Tuggle, was placed on trial, and sentenced to serve a term of twelve years in the state penitentiary. From that sentence an appeal was taken to this Court.

The difficulty, in connection with which Tuggle received the wounds which subsequently resulted in his death, occurred in the fall of 1938, and he died about the middle of February, 1939. He was stabbed in the chest nine times, one stab penetrating his lungs. A physician who was called to attend him found the wounds as described, and the patient in a condition of profound shock; and stated that the wound was the cause of his death. We quote his language in regard thereto: ''Well, in general English I call it abscess and breaking down of the lung tissue, and pus—he would spit that up.'' He further testified that the deceased had pus in his lungs for some time prior to his death, the presence of which caused chills sometimes three or four times a day. The deceased was treated at the hospital, and then returned to his home, and at times was up and about. About a week before his death he was returned to the hospital. On that day he became unconscious—or rather, unable to speak, and unconscious a portion of the time. On Saturday, just prior to his return to the hospital, he made a statement in regard to his condition and the cause of his death; and in a few hours thereafter became unable to speak.

The dying declaration made at that time was testified to by the father and mother of the deceased, and also by his wife, the statements being substantially alike, although differing in detail to some extent. The father, George Tuggle, testified, the first statement was made on the night of the 16th of September, on the preliminary examination by the court as to the admissibility of the dying declaration. But all statements except the one made on the Saturday that he was last returned to the hospital, and about one week before he died, were excluded; and the statement made on that day, testified to by the father, mother and wife, was admitted. On the preliminary inquiry the court went fully into all of the

testimony bearing on his condition, and all of the statements he made prior to this time, for the purpose of ascertaining the condition of decedent's mind in regard to his conviction that he was about to die, the inquiry taking a wide range. The statement admitted by the court is as follows:

"Now, Mr. Tuggle, you state to the court there in the absence of the jury just exactly what was said there around 9 o'clock that Saturday before he was carried to the hospital the same afternoon?"

Counsel for defendant: "We object to all that even in the absence of the jury."

No ruling.

"Q. Was he in or out of bed at that time? A. In bed.

"Q. Now, state to the jury just what he said? A. He was in a dying condition right then and people thought he couldn't live through the day.

"Q. Was he rational, knew what he was talking about? A. Yes, sir.

"Q. Go ahead and tell exactly what he said? A. He said, 'Mamma, I have got to die, you have done all you could for me but I have got to go.' He said, 'I am killed, you all can't help it.' He said, 'Make the best of it you can.' He said, 'God is calling me, I'm going home, home, sweet home, where there ain't no murderers there.' He said, 'Mamma, when are you coming?' And she couldn't answer she was crying so and I said, 'It won't be long with us until we will be there.' He said, 'Homer killed me for nothing because I wouldn't do the wrong thing.' But he said he was proud he didn't.

"Q. Did he say what the wrong thing was? A. Yes, sir.

"Q. What? A. Because he wouldn't swear a lie for him.

"Q. Did he say how he was killed? A. Yes, sir, killed him with a knife, stabbed him to death.

"Q. Did he say anything further? A. I think not, I don't remember. He talked a little along, some of the

neighbors came in. A little later Van came and run after some people to come there and they thought he would die before then, and they got Dr. Magee down and he gave him something to ease him off a little in the afternoon, and he said just to take him to the hospital and we did.''

The court, in ruling on the admissibility of the evidence, said: ''I think I will consider his statement at home on the day before he went to the hospital the last time in the evening. The statements that were made by him prior to that time and any transaction of business he might have had I don't believe to be competent, because it is in evidence here that he was up some, that he came to the grand jury about this same matter and I don't think—I think it is too remote. But I am going to admit the statement he testified about on Saturday, the day he went to the hospital the last time.'' Objection by counsel for the defendant: ''We submit that no part of this has qualified as a dying declaration and therefore object to its going to the jury.'' Overruled by the Court.

There was considerable examination by the court into the facts and conditions, on the preliminary hearing, from the time the wounds were inflicted until the date of his return to the hospital the last time, which was one week and a few hours prior to his death. The law pertaining to dying declarations has been discussed in many previous cases, and it is not necessary to refer at great length to it here. The condition of the deceased from the time of receiving the wounds until the time of making the statement which was admitted in evidence, as held by the judge on the preliminary trial, with a view to determining the question of whether or not, at the time of making this last statement, the deceased had the settled conviction that death was then upon him. He had received a wound in the lung, and believed that he could not recover —that he would ultimately die from the wound. Under this conviction he had a deed to certain lands made to his father, for the benefit of his children. The wound produced a condition in which pus was existent, of which the

deceased was aware for the reason that he had spit up
substance containing it, and had suffered from chills as
a result of its presence in his system. The facts and cir-
cumstances developed by this evidence are such as would
lead to the belief that the deceased had reached the settled
conviction that he was going to die; and his conviction at
the time of making the last statement, coupled with the
testimony of others, showed that he believed death to be
imminent, although he lived several days longer. On the
very day he made the statement his condition became
such that he was unable to speak, became unconscious,
and died.

There was other testimony concerning the cause of the
difficulty, including that of the defendant, who testified as
to the affair from his standpoint—that he stabbed the
deceased in self-defense, because he attacked, and was
choking him, and that he stabbed in order to release the
grip upon his throat. In this he was corroborated to a
certain extent by other witnesses who testified that they
saw bruises upon his throat shortly after the difficulty.

The evidence for the state corroborated the deceased
as to how the difficulty occurred. There was no eye-wit-
ness at the time of the actual occurrence. One witness for
the state testified to hearing an outcry from the appellant,
who, using a vile epithet, exclaimed, ''I think I have got
you—I have been laying for you two years—I think I have
got you now!,'' or words to that effect. Also, witnesses
heard Tuggle cry out to the effect that, ''He is cutting me
to death.''

The immediate cause of the difficulty seems to have
been that the appellant had been accused of stealing a
pistol, and that the deceased was a witness against him.
The appellant had consulted a fortune teller, who told
him that a person whose land adjoined his had actually
stolen it—describing the deceased without giving any
name. This was repeated by the appellant, and in some
way reached the deceased. On the day preceding the
night the difficulty occurred the appellant was at work

picking cotton for one, Van Sullivan, at whose home both he and Tuggle met after work was done. Soon after the deceased left the appellant followed, both going in the same direction. A few minutes later cries were heard, attracting the attention of Sullivan and others, who, however, did not arrive on the scene in time to prevent the stabbing. The deceased was coming back toward Sullivan's home, crying that "He has cut me to death," or words of similar import. It was too dark for the witness to identify the appellant at the time; though the appellant himself testified, giving his version of the difficulty and admitting the stabbing.

Considering all the evidence in the case, which is, of course, more elaborate and detailed than in this opinion, we think it is sufficient to show that the dying declaration was admissible, and that the evidence as a whole was sufficient to sustain the verdict of the jury. Consequently the judgment of conviction is affirmed.

Affirmed.